**2014-1648**

---

# United States Court of Appeals for the Federal Circuit

---

**ANTARES PHARMA, INC.,**

*Plaintiff-Appellant,*

***v.***

**MEDAC PHARMA, INC. AND MEDAC GMBH,**

*Defendants-Appellees.*

---

*Appeal from the United States District Court for the District of Delaware in Case No. 1:14-cv-00270, Judge Sue L. Robinson*

---

**NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLEES MEDAC PHARMA, INC. AND MEDAC GMBH**

Christopher J. Harnett
James F. Haley, Jr.
Ching-Lee Fukuda
Hassen A. Sayeed
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000

Attorneys for Defendants-Appellees
medac Pharma, Inc. and medac GmbH

August 15, 2014

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, counsel for Defendants-Appellees medac Pharma, Inc. and medac GmbH certifies the following:

1. The full name of every party represented by me is:

   medac Pharma, Inc.

   medac GmbH

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   The parties named in the caption are the real parties in interest.

3. The parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

| | |
|---|---|
| Ropes & Gray LLP | Christopher J. Harnett, James F. Haley, Jr., Ching-Lee Fukuda, Hassen A. Sayeed, Jacqueline M. James, Steven K. Mossey, Adam D. Steinmetz |
| Morris, Nichols, Arsht & Tunnell LLP | Jack B. Blumenfeld, Ethan Haller Townsend, Maryellen Noreika |

Dated: September 18, 2014

Respectfully submitted,

*/s/ Christopher J. Harnett*
Christopher J. Harnett
ROPES & GRAY LLP

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i
TABLE OF ABBREVIATIONS .......... viii
STATEMENT OF RELATED CASES .......... 1
STATEMENT OF THE ISSUE .......... 2
INTRODUCTION .......... 3
STATEMENT OF THE CASE .......... 10
COUNTERSTATEMENT OF FACTS .......... 12
A. The ‘846 Patent Specification .......... 12
1. Antares Differentiated Needle-Assisted Jet Injectors From Other Types Of Injectors .......... 12
2. Antares Unequivocally Characterized Its Claimed Invention As A Jet Injector .......... 14
3. The ‘846 Patent Describes Safety Features Exclusively In The Context Of Needle-Assisted Jet Injectors .......... 15
4. The ‘846 Patent Has Only Two Embodiments -- Both Are Needle-Assisted Jet Injectors .......... 16
a. Figures 1-13 Depict A Needle-Assisted Jet Injector .......... 17
b. Figures 14-26 Also Depict A Needle-Assisted Jet Injector .......... 18
B. The Prosecution History Of The Original ‘015 Patent .......... 19
1. Antares Repeatedly Stressed The Importance Of The “Jet” Limitations To Distinguish The Art During Prosecution .......... 20
2. Antares Amended Its Claims And Submitted A Declaration To Highlight The Jet Features .......... 21
3. Antares Relied On Structural Differences Between Jet and Non-Jet Injectors For Patentability .......... 22
C. The Asserted Reissue Claims Rely For Support On The Needle-Assisted “Jet Injector” Disclosure Of The Original ‘015 Patent .......... 24
D. The Original ‘015 Patent Included Several Claims Directed To Safety Features .......... 25

E. Antares Monitored Medac's Innovations ....... 27

SUMMARY OF THE ARGUMENT ....... 29

ARGUMENT ....... 32

A. Standard Of Appellate Review ....... 32

B. The District Court Correctly Applied The Three-Step Recapture Analysis ....... 32

C. Antares's Attack On The District Court's Analysis Is Premised On Mischaracterizations Of The Opinion And The Controlling Law ....... 35

D. Antares's Argument That This Case Is An "Issue Of First Impression" Is Incorrect ....... 39

1. This Court's Decision In *Hester* Is Controlling And The District Court Properly Applied That Decision ....... 40

2. The District Court's Decision Is Also Consistent With *Mostafazadeh* ....... 42

E. Antares's Efforts To Claim Non-Jet Injectors Is Inconsistent With The "Original Patent" Requirement Of 35 U.S.C. § 251 ....... 45

1. Antares Ignored The "Original Patent" Requirement During Preliminary Injunction Proceedings ....... 46

2. The Entirety Of The '015 Patent Disclosure Is Directed To Needle-Assisted Jet Injectors ....... 47

a. The "Present Invention" Statements Limit Antares's Patent To Needle-Assisted Jet Injectors As A Matter of Law ....... 48

b. Antares's Argument About the Word "Particularly" Is Unsound ....... 49

3. Antares's Failure To Satisfy The "Original Patent" Requirement Is An Alternate Ground For Affirmance ....... 50

F. Antares's Arguments About The Kramer Prior Art Reference Are Unavailing ....... 51

G. Antares's Arguments About The District Court's Infringement Decision Are Incorrect ....... 53

1. The District Court Properly Construed "Jet Injector" In View Of Both Intrinsic and Extrinsic Evidence ....... 55

2. The District Court Properly Held That Medac's Product Is Not A "Jet Injector" ....................58

H. The District Court's Analysis Of The Remaining Three Preliminary Injunction Factors Does Not Help Antares ....................62

I. The Relief That Antares Seeks Is Legally Inappropriate ....................63

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....................66

**Information Under Protective Order**

The material omitted on pages 10, 11, 27, 42, 55, and 56 concerns information designated as "Confidential Information" by Plaintiff-Appellants under the District Court's Protective Order. In particular, the information relates to internal documents that Plaintiff-Appellants designated as Confidential.

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) ........................................................................65

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) ......................................................................64

*Astrazeneca AB v. Hammi USA*,
554 Fed. Appx. 912 (Fed. Cir. 2014)..............................................................47

*Belkin Int'l, Inc. v. Kappos*,
696 F.3d 1379 (Fed. Cir. 2012) ......................................................................38

*Bose Corp. v. SDI Techs., Inc.*,
558 Fed. Appx. 1012 (Fed. Cir. 2014)............................................................49

*Broadcom Corp. v. Qualcomm, Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ........................................................................49

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ......................................................................49

*Datascope Corp. v. SMEC, Inc.*,
879 F.2d 820 (Fed. Cir. 1989) ........................................................................49

*Ethicon, Inc. v. Quigg*,
849 F.2d 1422 (Fed. Cir. 1988) ......................................................................38

*Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981)..........................................................................................39

*Glaxo Group v. Torpharm, Inc.*,
153 F.3d 1366 (Fed. Cir. 1998) ..................................................................49, 50

*Guttman, Inc. v. Kopykake Enters.*,
302 F.3d 1352 (Fed. Cir. 2002) ..................................................................63, 65

*Hester Indus., Inc. v. Stein, Inc.*,
142 F.3d 1472 (Fed. Cir. 1998) ..................................................................*passim*

*In re Amos*,
953 F.2d 613 (Fed. Cir. 1991) ........................................................8, 44, 45, 46

*In re Aoyama*,
656 F.3d 1293 (Fed. Cir. 2011) ..................................................................50

*In re Mostafazadeh*,
643 F.3d 1353 (Fed. Cir. 2011) ..........................................................*passim*

*In re Youman*,
679 F.3d 1335 (Fed. Cir. 2012) ..........................................................*passim*

*Lear Siegler, Inc. v. Aeroquip Corp.*,
733 F.2d 881 (Fed. Cir. 1984) ....................................................................56

*McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*,
24 F.3d 519 (3d Cir. 1994) .........................................................................62

*Medtronic, Inc. v. Guidant Corp.*,
465 F.3d 1360 (Fed. Cir. 2006) ............................................................31, 50

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) ............................................................34, 43

*Nystrom v. Trex Co.*,
580 F.3d 1281 (Fed. Cir. 2009) ..................................................................50

*Ormco Corp. v. Align Technology, Inc.*,
498 F.3d 1307 (Fed. Cir. 2007) ..................................................................36

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.*,
718 F.3d 1350 (Fed. Cir. 2013) ..................................................................61

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..................................................................56

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ....................................................................47

*Seattle Box Co., Inc. v. Indus. Crating & Packaging Inc.*,
756 F.2d 1574 (1985)...................................................................................64

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ....................................................................36

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ....................................................................61

*Titan Tire Corp. v. Case New Holland Inc.*,
566 F.3d 1372 (Fed. Cir. 2009) ....................................................................31

**RULES & STATUTES**

Fed. Cir. R. 47.5(a). ...........................................................................................1

35 U.S.C. § 112 .........................................................................................8, 44

35 U.S.C. § 251 .........................................................................................*passim*

35 U.S.C. § 252 ..........................................................................................64

## TABLE OF ABBREVIATIONS

| Abbreviation | Explanation |
|---|---|
| §251 | 35 U.S.C. § 251 |
| ‘846 [reissue] patent | U.S. Patent No. RE44,846 |
| ‘015 patent | U.S. Patent No. 7,776,015 |
| ‘631 patent | U.S. Patent No. 8,480,631 |
| A___ | The cited page(s) of the Joint Appendix |
| A___/___ | The cited page(s) of the Joint Appendix/the specific portion of the cited page(s) |
| ANT___ | The cited pages of Antares’s Appeal Brief |
| Antares | Plaintiff-Appellant Antares Pharma, Inc. |
| Medac | Defendant-Appellee medac Pharma, Inc. |
| medac GmbH | Defendant-Appellee medac GmbH |
| MPEP | Manual of Patent Examining Procedure |
| PTO | United States Patent and Trademark Office |
| FDA | United States Food and Drug Administration |

**Emphasis** All emphasis in quoted text, and color appearing in figures, has been added unless otherwise noted.

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5(a), Fed. Cir. R., Medac and medac GmbH state that no appeal, other than the current appeal, has been taken in or from the same civil action or proceeding in the District Court.

## STATEMENT OF THE ISSUE

Medac respectfully submits that the "statement of the issue" articulated by Antares does not accurately characterize the District Court's Memorandum Opinion or the facts and law on which it was based. (ANT2.) Accordingly, Medac presents the following counter-statement:

> As part of the District Court's ruling that Antares's motion for preliminary injunction must be denied because Medac raised a substantial question on the issue of Antares's likelihood of success on the merits, did the District Court properly conclude that the asserted claims of the '846 reissue patent could not validly cover injection devices ***other than*** needle-assisted jet injection devices in view of:
>
> (a) the provisions of 35 U.S.C. § 251 and the controlling Federal Circuit case law addressing that statute;
>
> (b) the specification of the '846 reissue patent (and the original '015 patent) in which the patentees expressly stated that "[t]he present invention relates to a needle assisted jet injector" and in which the patentees did not include even a single embodiment of an injection device that was ***not*** a needle-assisted jet injector;
>
> (c) the prosecution history of the original '015 patent in which the patentees distinguished their claimed invention on the grounds that the prior art was not directed to needle-assisted jet injectors, and the prosecution history of the '846 patent showing that every figure and passage in the specification to which the patentees cited as support for the asserted reissue claims relates ***only*** to needle-assisted jet injectors; and
>
> (d) admissions by the named inventor confirming that ***all*** of the inventions of the '846 patent relate to a needle-assisted jet injector?

## INTRODUCTION

According to Antares, the present appeal is directed to a "straightforward legal issue concerning the application of 35 U.S.C. § 251." (ANT3.) Antares complains that the District Court erred in undertaking the well-established three-part recapture analysis because the District Court did not "first" determine whether its reissue claims were directed to "overlooked aspects" of the alleged invention. (ANT3-4; ANT23.) Specifically, Antares argues that the "overlooked aspects doctrine" is a "threshold" question that should have precluded the District Court from considering the recapture rule. (ANT23.) Antares's argument is both factually and legally incorrect.

***<u>The safety features are not "overlooked" aspects</u>.*** As a preliminary matter, the supposedly "overlooked aspects" to which Antares points -- "safety features" that "protect" users "from accidently sticking themselves with a needle" -- were not overlooked at all. (ANT4.) Indeed, the original '015 patent included several claims that were directed to needle-assisted jet injectors with safety features designed to protect against accidental needle sticks. For example, claim 17 recites:

> 17. The ***jet injection device*** of claim 16, further comprising an ***activation element*** operatively associated with ***the shield*** such that the ***activation element*** activates the force generating source upon retraction of ***the shield*** from the ***protecting position*** to the injection position. (A67/15:22-26.)

Original claim 16 -- from which claim 17 depends -- provides that the claimed needle shield occupies "a ***protecting position***, in which the needle is disposed within the guard . . . ." (A67/15:18-19.) And, the "jet injection device" of original claim 18 includes a safety-related "retraction element configured for ***retracting the needle*** into the housing member after the medicament is ejected." (A67/15:27-29.) Thus, the original '015 patent included several claims directed to jet injectors adapted with features that prevent accidental needle sticks before and after injection, including the same "needle guard" or "needle shield," that Antares now claims were overlooked.

***Antares mischaracterizes the law.*** Antares's assertion that the District Court erred in its recapture analysis is premised on mischaracterizations of the law concerning the relationship between "overlooked aspects" and recapture. First, Antares's suggestion that the present case features "an issue of first impression" (ANT16) is incorrect. In cases where the facts closely parallel those presented here, this Court has held that a patentee was not permitted to invoke supposedly "overlooked aspects" to recapture previously surrendered claim coverage. *See Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1482-84 (Fed. Cir. 1998); *In re Mostafazadeh*, 643 F.3d 1353, 1360-61 (Fed. Cir. 2011).

Next, Antares relies on *In re Youman*, 679 F.3d 1335 (Fed. Cir. 2012), and argues:

> In *Youman*, this Court reiterated that the "overlooked aspects" doctrine is a "separate inquiry under reissue" ***as a threshold question*** to see if the recapture rule is triggered. (ANT23.)

Antares, however, truncated the quote from *Youman* and added the notion of a "threshold question." This Court ***actually*** stated the following in *Youman*:

> Rather, as we explained in *Mostafazadeh*, "overlooked aspects" is a separate inquiry under reissue ***that is independent of <u>whether or not</u> the recapture rule applies.***

*Youman*, 679 F.3d at 1347. There is, therefore, no legal support for Antares's assertion that "overlooked aspects" is a threshold inquiry to the recapture analysis.

Then, relying on its mischaracterization of the law, Antares argues that the recapture rule does not apply here because:

> The original "jet" claims focus on performance -- pressure, speed, time [] -- whereas the reissued claims address safety features that are very different and focus on needle stick prevention . . . . (ANT7.)

Putting aside the fact that the safety features were not really overlooked in the first place, nothing in the law would permit Antares to recapture the non-jet injectors that it previously surrendered -- both by argument and amendment -- during prosecution. Taken to its conclusion, Antares's argument would permit a patentee to avoid the recapture rule (and avoid the consequences of previous surrender) by simply pointing to ***any*** allegedly "overlooked" feature of an invention. That extraordinary rule would eviscerate the fundamental purpose of the recapture rule.

Indeed, Medac is unaware of any case in which the Federal Circuit ruled -- as Antares urges the Court to rule here -- that "overlooked aspects" can be invoked to nullify previous surrender of claim scope.

***Antares does not satisfy the "error" requirement.*** In conducting its analysis under §251, the District Court correctly observed that "[t]he Federal Circuit has found two requirements in §251(a)." (A11.) The first requirement is the "error" requirement and the "second and independent" requirement is the "original patent" requirement. (*Id*.)

With respect to the "error" requirement, the District Court pointed out that "'[o]ne of the most commonly asserted 'errors' in support of a broadening reissue is the failure of the patentee's attorney to appreciate the full scope of the invention during the prosecution of the original patent application.'" (*Id.* (citing *Hester*, 142 F.3d at 1479).) The District Court expressed concern that here, the record did not include any documentation from the prosecution history about the assertion of such an "error." (A13.) Indeed, Antares did not (and could not) direct the District Court to any representation that its prosecuting attorneys made to the PTO stating that they had "overlooked" allegedly inventive safety features during prosecution of the original patent. Nothing of the kind exists in the prosecution history precisely because safety features had ***already*** been claimed.

In accordance with controlling authorities, the District Court then undertook a review of the patent specification and the prosecution history both for arguments and claim amendments to determine whether Antares was seeking through reissue to regain "subject matter . . . surrendered in an effort to obtain allowance of the original claims." (A11-12.) In doing so, the District Court found that the entire specification of the patent was written in the context of a "jet injection device." (A14.) The District Court also observed that the prosecution history is "replete" with arguments and amendments in which Antares relied on the "jet injection" features to distinguish its claims from the prior art. (A13-14.)

Against that background, the District Court properly applied the three-part test established in Federal Circuit precedent: ***first,*** the District Court correctly found that the '846 reissue claims were broadened because the "jet" requirement was completely eliminated; ***second,*** the District Court correctly found that this attempted broadening related to the surrendered subject matter (*i.e.*, non-jet injectors); and ***third,*** the District Court correctly found that the '846 reissue claims failed to avoid recapture because the added safety limitations, to the extent that they narrow the scope of the claims, are unrelated to the jet limitation and are, therefore, not material. (A13-15.) *Youman*, 679 F.3d at 1347; *Mostafazadeh*, 643 F.3d at 1361.

***<u>Antares does not satisfy the "original patent" requirement of §251</u>***. Moving beyond the "error" requirement of §251 (and the related recapture analysis), the District Court also explained that §251 includes a "second and independent requirement" -- *i.e.*, the "original patent" requirement. (A11.) The District Court noted that "[t]he 'original patent' requirement . . . restricts a reissue patent to 'the invention disclosed in the original patent.'" (A11 (citing *Hester*, 142 F.3d at 1479).) As such, the reissue claims must be "described in the original patent specification and enabled by the original patent specification such that 35 U.S.C. § 112, first paragraph is satisfied." (A966 (MPEP §1412.01)); *In re Amos*, 953 F.2d 613, 618 (Fed. Cir. 1991).

The original '015 patent describes the "invention" ***exclusively*** in the context of "needle assisted jet injectors" and it does not include even a single embodiment that is anything other than a needle-assisted jet injector. Consequently, every figure and passage that the patentee cited as support for the asserted reissue claims relates only to a needle-assisted jet injector. (A598-99.) In that regard, the named inventor admitted that the inventions of the '846 patent related to a needle-assisted jet injector. (A540/110:10-22.)

Remarkably, in the briefs it submitted during the preliminary injunction proceedings below, ***Antares did not even try to address the original patent***

***requirement* --** even though the "original patent" requirement was addressed thoroughly in Medac's brief. (A487, 496-97.)

***The District Court properly concluded the asserted claims could not validly cover the accused product and denied Antares's Motion for Preliminary Injunction***. When all is said and done, the record of the preliminary injunction proceedings confirms that the District Court thoroughly considered the intrinsic evidence of the original and reissue patents and the requirements of §251. The District Court then correctly determined that none of the asserted claims could validly cover non-jet injectors. And, based on that determination, the District Court necessarily found that Medac had raised a substantial question about whether Antares could prevail on the merits. Accordingly, Medac respectfully submits that this Court should affirm the denial of Antares's motion for preliminary injunction.

*Confidential Material Redacted*

**STATEMENT OF THE CASE**

Antares filed its initial complaint against Medac on February 28, 2014. (A108.) Antares then filed a motion for a preliminary injunction directed to two patents -- U.S. Patent Nos. 6,565,553 and the '631 patent. (A192.) In that submission, Antares stated its intent to "supplement" its preliminary injunction motion to include two additional patents that had not yet issued. On March 25, 2014, the District Court advised Antares that it was impractical to address four patents in preliminary injunction proceedings. Subsequently, Antares amended its complaint and filed an "amended" preliminary injunction motion directed to the '631 patent and the '846 patent. (A194; A363.)

[redacted] When Antares discovered that medac GmbH had decided to partner instead with Becton Dickinson, Antares sought to prevent Medac from introducing its competing RASUVO™ product in the United States. Antares's internal strategy documents detailed its objective to [redacted] (A1062-63.) Antares's efforts to remove the "jet" limitations from its original '015 patent claims through reissue and its subsequent

preliminary injunction motion [redacted]

Shortly after initiating this litigation, Antares also filed a Citizen Petition asking the FDA to withhold approval for Medac's RASUVO™ product. (A985-86.) In its responsive submission to the FDA, Medac explained that Antares's Citizen Petition was premised on incorrect assertions with respect to: (1) the nature of RASUVO™ and its indications; and (2) the timing of Medac's Section 505(b)(2) application. (A1001-09.)

On July 10, 2014 the District Court issued its Order and Memorandum Opinion denying Antares's motion for a preliminary injunction because Antares failed to show that it was likely to succeed on the merits. On that same day, the FDA denied Antares's Citizen Petition, stating: "Antares's claims are based on a number of erroneous assumptions."

## COUNTERSTATEMENT OF FACTS

### A. The '846 Patent Specification

The '846 patent, entitled "Needle Assisted Jet Injector," issued on April 15, 2014 from an application filed June 22, 2012 as a reissue of the '015 patent. (A70.) The '015 patent issued on August 17, 2010 from an application filed December 3, 2004, claiming priority, through a series of continuation and divisional applications, to a provisional application filed August 11, 1998. (A32.)

#### 1. Antares Differentiated Needle-Assisted Jet Injectors From Other Types Of Injectors

According to the '846 patent, there are a "wide variety" of known injectors that "administer medication as a fine, high velocity jet" -- *i.e.*, "jet injectors." (A98/1:31-37; 1:64; 1:65.) Antares represented that an important advantage of jet injectors over non-jet injectors is fast injection time -- "jet injectors typically inject in fractions of a second." (A98/2:15-16.)

The '846 patent repeatedly describes "jet injectors" (including needle-assisted jet injectors) as being different from autoinjectors and manual syringes:

> Furthermore, as auto-injectors operate like syringes, the injection time is several seconds or longer. ***In contrast***, jet injectors typically inject in fractions of a second. (A98/2:14-16.)
>
> * * *
>
> While delivery of medicament by syringes and auto-injectors is limited by the length of the needle, the needle assisted jet injector

> according to the present invention delivers the medicament to a depth deeper than the length of the needle. (A101/8:20-23.)
>
> * * *
>
> Another advantage of the needle assisted jet injector according to the present invention, shown in the chart below, is the decreased injection time ***compared to*** syringes or auto-injectors. (A104/13:26-29.)
>
> * * *

Comparison of Operating Properties for Injection Devices

| | Spring Force (Lbf.) | Dia. Of Fluid Chamber (inches) | Avg. Pressure (psi) | Volume of Injection (ml) | Injection Time (sec) |
|---|---|---|---|---|---|
| Jet Injector | 110 | 0.233 | 2111 | 0.5 | 0.165 |
| 1st Needle Assisted Injector | 30 | 0.352 | 227 | 0.5 | <1 |
| 2nd Needle Assisted Injector | 15 | 0.231 | 233 | 0.5 | <1 |
| Conventional Syringe | N/A | 0.351 | 5 | 0.5 | 3-5 |

That above-referenced "chart" shows a comparison between: (1) a "jet injector;" (2) two different "needle assisted injectors;" and (3) a "conventional syringe." Based on that comparison, Antares touted the advantages of the needle-assisted jet injector. (A104/13:30-45.)

The '846 patent also describes problems with prior art injectors, including autoinjectors and manual syringes. For example, the needle "could lead to potential biohazards and safety concerns, such as accidental injections and spreading of diseases." (A98/2:23-25.) Prior attempts to solve this problem (*e.g.*,

by shielding the needle before and after injection) typically resulted in slowed injection times -- and thus the loss of the advantage of jet injection. (A98/2:32-42.) Antares, therefore, explained in the ‘846 patent that there exists a “need for a needle assisted ***jet injector*** . . . having a retractable or concealed needle to prevent the medical hazards associated with exposed needles.” (A98/2:45-50.)

### 2. Antares Unequivocally Characterized Its Claimed Invention As A Jet Injector

The term “present invention” appears ***22 times*** in the ‘846 reissue patent specification. In each and every instance, the “present invention” refers to a needle-assisted jet injector. (A98-A106/1:24; 2:54; 4:42; 5:7; 5:16; 5:18; 5:21; 5:24; 5:35-36; 6:19; 6:21; 6:53; 8:22; 8:63; 9:11; 9:16; 9:39; 12:35; 13:12; 13:15; 13:27; 13:62.) For example, the SUMMARY OF THE INVENTION section of the ‘846 patent states that “[t]he present invention relates to ***a needle assisted jet injector***.” (A98/2:54-55.) Moreover, every disclosed embodiment in the ‘846 patent is directed to a needle-assisted jet injector.

Dr. Peter L. Sadowski, the first-named inventor on the ‘846 patent and the current Chief Technology Officer of Antares, confirmed through his testimony that the invention of the ‘846 patent was a needle-assisted jet injector. (A540/110:10-13 (“Q. Okay. So would you agree that the ‘846 invention relates to a needle-assisted jet injector? A. Yes.”); A540/110:17-22 (“Q. And if you look at the -- all

the various figures of the ‘846 Patent, would you agree that they all depict parts of a needle-assisted jet injector? THE WITNESS: Yes.”).)

The ‘846 patent further teaches that “[t]he present invention also relates to a method of delivering medicament to an injection site of a patient.” (A99/4:42-43.) The method includes “applying a force sufficient to eject the medicament from the fluid chamber and through the needle to deliver the medicament to the injection site in less than about 2.75 seconds.” (A99/4:50-52.) During Dr. Sadowski’s deposition, he testified that this method also requires a needle-assisted jet injector. (A554-55/261:9-262:5; A99/3:28-37.)

### 3. The ‘846 Patent Describes Safety Features Exclusively In The Context Of Needle-Assisted Jet Injectors

The ‘846 patent also describes safety features as being important to needle-assisted jet injectors, in view of the high activation force, pressure and speeds associated with the ejection of the needle and medicament. Five such examples from the specification are reproduced below:

> In a preferred embodiment, the ***jet injector*** includes . . . a ***needle guard*** located at the distal end of the housing for concealing the needle, the needle guard being moveable between a protecting position and an injecting position . . . . (A99/3:28-40.)
>
> * * *
>
> The ***jet injector*** can also include a locking element associated with the needle guard for ***locking the needle guard in the protecting position*** after activation of the injection ***device*** and after return of the needle guard to the protecting position, to prevent re-exposure of the needle. .

> . . Retraction of the ***needle guard*** to the injecting position urges the ***latch*** toward the firing position, thereby releasing the ***trigger projections*** from the plunger and activating the injection device. (A99/3:61-4:7.)
>
> * * *
>
> The ***jet injector*** may also include a removable ***safety cap*** . . . . (A99/4:23.)
>
> * * *
>
> As shown in FIG. 1, a ***jet injector*** 10 according to the present invention comprises . . . [inertia] mass can be adjusted to accommodate different types of injections, ***taking into consideration***, for instance, the viscosity of the medication, the initial ***pressure build up*** desired, the ***strength of energy source*** 18, and the ***depth of injection penetration***, etc. . . . One important ***safety aspect*** of this feature is that ram 32 cannot become a ***dangerous projectile*** if injector 10 is fired when nozzle assembly 12 is not present. (A101/6:20-21; 7:11-21.)
>
> * * *
>
> There also exists a need for ***such an injector [a needle assisted jet injector]*** having a ***retractable or concealed needle*** to prevent the medical hazards associated with exposed needles. (A98/2:47-50.)

#### 4. The '846 Patent Has Only Two Embodiments -- Both Are Needle-Assisted Jet Injectors

The '846 patent describes two embodiments: both are needle-assisted jet injectors. (A98-99/2:55-3:27; A99/3:28-4:41.) The first embodiment is depicted in Figures 1-13. (A72-A82.) The second embodiment is depicted in Figures 14-26. (A83-A97.) There are no other depictions of the invention and no other described embodiments.

### a. Figures 1-13 Depict A Needle-Assisted Jet Injector

Regarding the first embodiment of the needle-assisted jet injector (shown in Figures 1-13), in the BRIEF DESCRIPTION OF THE DRAWINGS section, the patent states that "FIG. 1 is a cross-sectional view of a ***needle assisted jet injector*** according to the present invention." (A100/5:6-7.)




*Fig. 1*

(A72.) As provided in the DESCRIPTION OF THE PREFERRED EMBODIMENTS section of the patent, Figure 1 is "a jet injector 10 according to the present invention." (A100/6:20-21.) The other elements of this embodiment are described as being relative to the front, axis or surface of "jet injector 10." (A100/6:27; 6:29; 6:32.)

This first embodiment -- which "deliver[s] the medicament to the desired region [of the body] by ***jet injection***" -- includes numerous safety features. (A101/8:17-18.) The '846 patent discloses that "[o]ne important ***safety aspect*** of

this feature is that ram 32 cannot become a dangerous projectile if injector 10 is fired when nozzle assembly 12 is not present." (A101/7:19-21.) The patent also discloses that this first embodiment has a "retraction element" which provides a "recoil force once the medicament is expelled so that needle tip 76 will retract back into nozzle opening 24." (A101/8:38-41.)

### b. Figures 14-26 Also Depict A Needle-Assisted Jet Injector

With regard to the second embodiment, the BRIEF DESCRIPTION OF THE DRAWINGS section provides that "FIG. 14a is a cross-sectional view of a ***needle assisted jet injector*** according to a preferred embodiment of the present invention." (A100/5:34-36.)




*Fig. 14A*

(A83.) As provided in the DESCRIPTION OF THE PREFERRED EMBODIMENTS, this second embodiment of the needle-assisted jet injector includes an energizing device "capable of producing an injection of up to 2 ml in about 2.5 seconds or less." (A102/9:52-54.) In this figure, that energizing device

is shown as element no. 240, a compression spring. (A102/9:52-54.) The patent then discloses how the "jet injector" of Figure 14a is fired. (A102/9:59-60.)

The second embodiment also includes additional features that are not depicted in the first embodiment of the '846 patent. These additional features include "a retractable shield around the needle" (A102/9:39-40), referred to as a "needle guard 540" (A102/10:43-45). The needle guard fulfills one of the needs that the '846 patent attempts to satisfy -- the need to prevent medical hazards resulting from exposed needles in a needle-assisted jet injector. The additional features of the second embodiment also include a latch (A102/9:56-64; A103/11:12-25) and a push button (A103/12:10-14). Antares describes both the latch and push button as safety features. (ANT4.)

**B. The Prosecution History Of The Original '015 Patent**

During the prosecution of the '015 patent -- the original patent from which the '846 patent was reissued -- Antares repeatedly distinguished prior art on the basis that the proposed claims required a "jet injection device" and other features specific to a "jet injector." In particular, Antares represented to the PTO that: (a) a jet injector defines a structurally unique type of injector that is distinguishable from a manual syringe and an autoinjector; (b) non-jet injectors (*i.e.*, manual syringes and autoinjectors) cannot be modified to be jet injectors; and (c) jet

injectors deliver a powerful jet that penetrates tissue instead of being deposited as a bolus. (A558-59; A572-73; A581-84.)

### 1. Antares Repeatedly Stressed The Importance Of The "Jet" Limitations To Distinguish The Art During Prosecution

The original independent claims of the application that ultimately issued as the '015 patent recited a "jet injection device" in the preamble, and each dependent claim referred back to "the jet injection device" of its respective independent claim. (A648-51.) In response to the first Office Action, Antares argued that "[j]et injectors, unlike [the prior art], ***deliver the medicament in a high velocity jet*** that penetrates the tissue beyond the needle orifice due to the speed and configuration of the jet itself." (A653.)

When the PTO declined to consider the preamble language in considering patentable distinctness over the prior art, Antares responded that "recitation of '[a] jet injector' [in the preamble] is definitely structural and significantly affects the structural recitations in the body of the claim." (A559.) Antares insisted that "[s]everal elements recited in the claim, such as the force-generating source and the needle, would have a ***different construction in a jet injector than in other types of injectors, such as*** hypodermic [syringes] or ***auto-injectors*** . . . ." (A559.) Because of the "structural" aspects of a "jet injector," Antares concluded that the preamble "defines a different type of injector than a manual syringe or auto-injector; and must be given weight . . . ." (A559.)

### 2. Antares Amended Its Claims And Submitted A Declaration To Highlight The Jet Features

Antares eventually amended the body of claim 1 to require the force generating source of the injector to move the plunger to "jet inject" the medicament through an injecting end of the device. (A760.) When the PTO maintained the previous rejections even after this amendment, Antares submitted a response, together with a Declaration of Paul R. Lesch, Jr., one of the named inventors. (A566-78; A580-88; A32.) In that response and Declaration, Antares reiterated earlier arguments and presented further distinctions between jet injectors, on the one hand, and autoinjectors and hand-powered syringes, on the other hand.

For example, in that response and Declaration, Antares again noted that unlike a jet injector, a "***non-jet injector*** . . . typically ***deposits the medicament as a bolus*** at the tip of the needle due to the much slower and lower-powered flow of the medicament . . . ." (A581.) A "common type of automated injector," according to Antares, "is the autoinjector, which is a traditional syringe injector that includes a mechanism for automating the driving of the injector in a way that

mimics a hypodermic-syringe injection that is powered by hand."[1] (A582.) By mimicking a hand-powered syringe, autoinjectors deposit medicament as a bolus: "***[a]utoinjectors*** and other types of automated injectors such as the [prior art] device . . . deposit the injected medicament in the same manner as would a hand-powered syringe: the ***medicament is typically deposited in a bolus*** at the tip of the needle due to the slow and low-powered flow of the medicament . . . ." (A582.) In contrast, "[t]he jet from a ***jet injector*** is powerful enough to penetrate through a depth of tissue, such as muscle or skin layers, ***instead of*** being deposited as a bolus." (A558.)

### 3. Antares Relied On Structural Differences Between Jet and Non-Jet Injectors For Patentability

Antares further represented to the PTO that medicament delivery by a jet injector "is very different from that of a non-jet injector" and "requires significant structural elements that are very different from those of a non-jet injector." (A572.) During his deposition, Dr. Sadowski confirmed the accuracy of those

---

[1] During his deposition, Dr. Sadowski confirmed that autoinjectors mimic the action of hand-powered syringes. (A1188/33:2-7 ("the low-powered auto injectors and they're just needle introducers basically, but they push the drug into the subject. And they are designed to emulate a needle and syringe."); A1198-99/66:16 -67:2 ("Q. Do you agree that auto injectors deposit the injected medicament in the same manner as would a hand-powered syringe, the medicament is typically deposited in a bolus at the tip of the needle due to the slow and low-powered flow of the medicament? THE WITNESS: A -- a low-powered injector will deposit the drug primarily around the needle.").)

statements. (A534/104:13-20.) Examples of these "significant structural elements" include "firing and trigger mechanisms," a "substantially more powerful and faster energy source," a "jet nozzle," and "robust medicament container," all of which are used to form the "high-speed" and "high-power" jet. (A581.)

Antares also argued to the PTO that autoinjectors ***cannot be modified*** to become jet injectors:

> Autoinjectors and other slow-injection automated injectors, such as [the prior art], are also structurally different from a jet injector. Significantly, the structural construction of automated injectors are suitable only for slow and low-powered injection, and ***cannot provide a high-energy, high-pressure jet that is characteristic of jet injection***. Further, even though automated injectors may include certain structural features that are also found in a jet injector, such as a spring, ***automated injectors cannot properly be modified to be jet injectors because of their significant and fundamental differences in construction and function***. (A582-83.)

Dr. Sadowski confirmed that jet injectors and autoinjectors are not interchangeable. Indeed, he testified that: "low-powered automated injectors cannot properly be modified to jet injectors because of their significant and fundamental differences in construction and function." (A539/109:3-10; *see also* A1192/59:14-18; A1186/28:19-22; A534/104:7-12.)

Antares asserted also during prosecution that "achieving a jet injector is not a matter of routine modifications." (A573; A583-84.) In particular, because a jet injector requires "significant structural elements," one of ordinary skill in the art "would have understood that various parameters of the present device, such as the

length, diameter, gauge, and pressure, are not routine changes, since varying these parameters can keep the device from properly working as a jet injector." (A573; A583-84.) Dr. Sadowski confirmed that assertion during his testimony. (A534-37/104:21-107:24.)

### C. The Asserted Reissue Claims Rely For Support On The Needle-Assisted "Jet Injector" Disclosure Of The Original '015 Patent

When Antares filed the reissue application leading to the '846 patent, Antares kept all the original claims of the '015 patent unchanged and added new reissue claims 23-34. The reissue claims 23-34 did not include jet limitations. During prosecution of the reissue patent, Antares added new independent reissue claim 35 reciting an "injection device" -- not a "jet injection device" -- and including the "latch," precompressed "spring," and "pushbutton" limitations. (A595-96; A602.)

During prosecution of the '846 patent, Antares cited as support for the "injection device" of independent reissue claim 35 -- which issued as claim 31 -- the following portions of the '015 patent specification: "col. 3, lines 50-67, col. 4, lines 1-2, col. 6, lines 48-52, col. 9, lines 56-64, col. 10, lines 43-47, col. 11, lines 12-41, col. 12, lines 9-14, Fig. 14(a), Fig. 14(b)." (A598-99.) Antares also set forth a table showing support in the specification of the '015 patent for the reissue claims. (A598-99).

***In each and every case***, the support in the '015 patent that Antares identified in that table as supporting the subject matter of the reissue claims is directed to needle-assisted jet injectors. (*See supra*, pp. 14-15 (citing A540/110:10-13; A540/110:17-22.) Indeed, Antares has never pointed to anything in those cited passages that is ***anything other*** than a needle-assisted jet injector. For example, in its brief, the only portion of the specification to which Antares points as describing the aspects of the original patent that it contends were "overlooked" is column 11, line 57 through column 12, line 14. (ANT9.) All of the features described in that portion of the specification are directed to the embodiment of (and refer to claim element numbers within) Figures 14a and 14b. The specification unambiguously describes both Figures 14a and 14b as cross-sectional views of "a needle assisted ***jet injector***." (A100/5:34-39.)

**D. The Original '015 Patent Included Several Claims Directed To Safety Features**

As shown below, the original claims of the application that became the '015 patent -- *e.g.*, claims 15-18 -- included limitations related to safety features and those claims issued in the '015 patent (A650):

> 15. The ***jet injection device*** of claim 1, wherein the ***housing member*** has a ***concealing association with the needle***, wherein the device is configured such that the needle injecting end is extendable from the housing member to allow the insertion to the needle insertion point. (A650; A67/15:10-14.)

> 16. The ***jet injection device*** of claim 15, wherein the housing member comprises a ***needle shield*** located at the distal end of the housing member ***for concealing the needle***, the ***needle shield*** being moveable between: a ***protecting position***, in which the needle is disposed within ***the guard*** prior to activation, and an injecting position, in which the tip of the needle is exposed for insertion to the insertion point. (A650; A67/15:15-21.)
>
> 17. The ***jet injection device*** of claim 16, further comprising an ***activation element operatively associated with the shield*** such that the activation element activates the force generating source upon retraction of ***the shield*** from the ***protecting position*** to the injection position. (A650; A67/15:22-26.)
>
> 18. The ***jet injection device*** of claim 1, further comprising a ***retraction element*** configured for ***retracting the needle*** into the housing member after the medicament is ejected. (A650; A67/15:27-29.)

The Examiner repeatedly rejected these claims in view of the prior art. (A652; A562; A574; A665; A774; A785.) In response, Antares argued that all of the pending claims were distinct from the prior art injectors because "jet injectors" were significantly different. Antares also made separate arguments directed to claim 17, alleging that the prior art did not teach the "activation element" safety feature. (A654.)

Ultimately, the PTO allowed the '015 patent. In the Notice of Allowance, the Examiner stated that:

> The claims in this application have been allowed because the prior art of record fails to disclose either singly or in combination the claimed apparatus of a ***jet injection device*** with the ***high speed jet*** with a ***fluid pressure between about 100 and 1000 p.s.i.*** to penetrate tissue through and axially beyond the insertion point and such that the injecting end reaches a needle point at ***a depth of up to about 5mm***

> below the surface along (***or no more then [sic] 5mm***) along with a ***mechanical member that is elastically deformed*** to provide the force. (A676.)

## E. Antares Monitored Medac's Innovations

Medac is an innovator in the injectable methotrexate space and its parent, medac GmbH, is the leader in the European market for such products. (A3.) [redacted]

[redacted]

Antares filed new independent reissue claim 35 reciting an "injection device" and

including "latch," precompressed "spring," and "pushbutton" limitations in September 2013, shortly after Medac GmbH launched its methotrexate autoinjector product in Europe. (A595-96; A602; A1139/¶20.)

## SUMMARY OF THE ARGUMENT

In the voluminous submissions that Antares presented to the District Court, the entirety of Antares's arguments about "overlooked aspects" appeared for the first time in its reply brief and was limited to approximately one-quarter of a page. (A824-25.) That is because the plain words of the '015 patent confirm that there were not any "overlooked aspects" at all. Claims 15-18 of the original '015 patent are directed to needle-assisted jet injectors adapted with safety features for prevention of accidental needle sticks, which is what Antares now asserts to have been overlooked. It is not surprising, therefore, that Antares could not point the District Court to ***any*** statement from the prosecuting attorneys to the PTO -- either sworn or unsworn -- that the '846 reissue application was appropriate because Antares had erroneously overlooked "safety aspects" during the prosecution of the '015 patent. (A13-14.)

Faced with an "overlooked aspects" argument that has no basis in fact, Antares repeatedly asks this Court to compare claim 1 of the original '015 patent and claim 31 of the '846 reissue patent. Using that comparison, Antares argues that there can be no recapture issue because claim 1 is directed to "jet" features and claim 31 is directed to "safety" features. But, Antares's argument is diversionary. The more appropriate comparison is between claims 15-18 of the original patent and claim 31 (and the other asserted claims) of the reissue patent. ***Both sets of***

***claims*** are directed to injectors adapted with safety features to prevent accidental needle sticks and differ primarily in the fact that the original claims are expressly limited to jet injectors, while the reissue claims are not.

Moreover, during prosecution of the original ‘015 patent, Antares -- both by argument and amendment -- made crystal clear that its claimed invention (including claims 15-18) was a “jet injection device,” not any other kind of injection device existing in the prior art. Beyond that, there is nothing in the ‘846 patent that teaches or discloses anything other than jet injectors. Under these circumstances, Antares’s efforts -- based on competitive motives and unsupported attorney argument -- to expand the scope of its claims to cover surrendered non-jet injectors are inconsistent with §251.

After a thorough analysis of the law relating to recapture, the intrinsic evidence, and the admissions of Antares’s inventor, the District Court correctly concluded that the asserted ‘846 claims could ***not*** validly cover non-jet injectors. Accordingly, the District Court found that Antares was not likely to succeed on the merits.

In opposing Antares’s motion for extraordinary relief, Medac raised several substantial questions pertaining to the weakness of the ‘846 patent and Antares’s infringement allegations. Accordingly, the District Court properly denied Antares’s preliminary injunction motion. Indeed, there are other grounds (which

the District Court did not need to reach) that also support affirmance -- such as Antares's failure to satisfy the "original patent" requirement of §251. That is a pure question of law and Antares did not even try to rebut Medac's showing on that issue during preliminary injunction proceedings.

# ARGUMENT

## A. Standard Of Appellate Review

A trial court's decision to deny a preliminary injunction, "will be overturned only upon a showing that the court abused its discretion." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009). "Abuse of discretion is a deferential standard of review that requires a showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Id.* (internal quotation omitted).

The recapture doctrine of §251 is a question of law that is reviewed *de novo*, but "[t]he legal conclusion of whether an applicant has met the statutory requirements of 35 U.S.C. § 251 is based on underlying findings of fact, which [the Federal Circuit] sustain[s] unless they are clearly erroneous." *Medtronic, Inc. v. Guidant Corp.*, 465 F.3d 1360, 1373 (Fed. Cir. 2006).

## B. The District Court Correctly Applied The Three-Step Recapture Analysis

In its July 10, 2014 Memorandum Opinion, the District Court conducted the proper analysis under §251 as set forth in controlling Federal Circuit authorities. In first addressing the "error" requirement, the District Court explained that, to determine "whether such an error actually supports the new claims, a review of the prosecution history of the original patent must be

undertaken to ensure that [the] patentee does not regain 'through reissue . . . subject matter that he surrendered in an effort to obtain allowance of the original claims." (A11-12 (citing *Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1480 (Fed. Cir. 1998).) The District Court also recognized that the proper analysis of "whether an applicant surrendered particular subject matter" involves a review of the "prosecution history for ***arguments*** and changes to the claims made in an effort to overcome a prior art rejection." (A12 (emphasis in original).) The District Court further explained that, "[i]f the court concludes that there has been a surrender, it 'must next determine whether the surrendered subject matter has crept back into the asserted reissue claims.'" (A12 (citing *Hester*, 142 F.3d at 1482).) In that regard, the Court recognized:

> If the above described prongs of the recapture rule have been satisfied, the rule can be avoided only if the reissue claims "are materially narrower in other overlooked aspects of the invention. The purpose of this exception to the recapture rule is to allow the patentee to obtain through reissue a scope of protection to which he is rightfully entitled for such overlooked aspects." [*Hester*, 142 F.3d] at 1482-83. Therefore, "[u]nless the claims are materially narrowed in a way that ***avoids substantial or whole recapture of the <u>surrendered subject matter</u>***, the surrendered subject matter has crept into the reissue claims and they are barred under the recapture rule." *In re Youman*, 679 F.3d 1335, 1344-45 (Fed. Cir. 2012). (A12-13.)

The District Court then proceeded to correctly apply this recapture analysis. First, the Court observed that the "prosecution history of the [original] '015 patent is replete with arguments and amendments made to distinguish . . .

prior art references . . . wherein the distinguishing feature of the invention was characterized as a 'jet injector,'" and that, "[o]n multiple occasions, the applicants argued that 'the jet injector of the present claims' is 'significantly different'" from prior art autoinjectors. (A13-14.) The applicants even amended their claims to "further buttress the fact that their invention was different from other injectors." (A14.) The District Court also noted that "[e]ach of the original 22 claims refers to a 'jet injection device,' and the specification is written in the context of a 'jet injection device.'" (A14.)

Second, based on its review of the reissued patent and the prosecution history, the District Court correctly found that "the reissue claims are broader, in that they do not recite the limitation 'jet injection device' but, rather, 'an injection device.'" (A14.) And, "[g]iven the prosecution history . . . there is every indication that the applicants surrendered all injectors but for 'jet injectors.'" (A14.) Likewise, the Court observed that:

> [T]he applicants argued that "jet injectors" affected the structural recitations in the body of the original claims and, as noted, the structural features now claimed in the '846 patent were described in the specification of the '015 patent ***only*** in the context of a jet injector. (A14.)

Accordingly, the District Court concluded that "the surrendered subject matter -- prior art injectors that would not be considered 'jet injectors' to those of skill in the art at the time -- has crept into the reissue claims." (A15.) The broader aspect of

the reissue claim directly related to the subject matter surrendered in the original prosecution of the ‘015 patent -- *i.e.*, non-jet injectors.

The District Court then addressed the third prong of the recapture analysis, *i.e.*, “whether the recapture rule can be avoided because the applicants did not recapture everything they surrendered.” (A15.) Citing *Mostafazadeh*, the District Court observed that “[t]o avoid recapture for claims that are broader in some respects and narrower in others, ‘the narrowing must relate to the subject matter surrendered during the original prosecution . . . .’” (A15.) The District Court performed that analysis on an element-by-element basis in accordance with *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1350 (Fed. Cir. 2005), and concluded that “the ‘jet injector’ and needle length limitations” were “entirely eliminated” in the reissue claims and that “no new restriction was imposed on the injector . . . that would avoid the recapture rule.” (A15.)

**C. Antares’s Attack On The District Court’s Analysis Is Premised On Mischaracterizations Of The Opinion And The Controlling Law**

Antares’s appeal rests on its argument that the District Court erroneously imported the “overlooked aspects” doctrine into the third prong of the recapture rule. (ANT25-26.) That is incorrect. The District Court’s substantive conclusions are entirely consistent with this Court’s precedent governing recapture.

The District Court explained its finding that the safety limitations in Antares’s reissue claims were not materially narrowing relative to the surrendered

subject matter of non-jet injectors. (A15.) As a result, Antares could not avoid recapturing that subject matter. "Here, the 'jet injector' and needle length limitations of the claims were entirely eliminated on reissue ***and no new restriction was imposed on the injector or needle that would avoid the recapture rule***." (A15.) Having intentionally surrendered non-jet injectors during prosecution of the '015 patent, Antares could not negate that surrender by tacking on unrelated "safety" limitations in reissue claims simply by invoking "overlooked aspects." That would vitiate the recapture rule.[2]

In its brief, Antares tries to divert attention from the District Court's correct ***legal analysis*** by focusing on one out-of-context sentence in the District Court opinion suggesting that the third prong of the recapture rule "can be avoided only if the reissue claims 'are materially narrower in other overlooked aspects of the invention.'" (ANT26.) From this sentence in isolation, Antares alleges that the District Court misunderstood the "overlooked aspects" doctrine and applied the recapture rule improperly. But Antares's argument holds no water because the

---

[2] Because Antares intentionally surrendered non-jet injectors during prosecution, it cannot now claim that its failure to seek claims directed to ***all*** injectors was correctable error. *In re Youman*, 679 F.3d 1335, 1347 (Fed. Cir. 2012) ("When a patentee is narrowing its claim limitations due to prior art that would otherwise render the claims unpatentable, the patentee can only be doing so deliberately, without any possibility of error.").

District Court proceeded to explain correctly how the third prong of the recapture rule is actually applied:

> Therefore, "[u]nless the claims are materially narrowed in a way that avoids substantial or whole recapture of the surrendered subject matter, the surrendered subject matter has crept into the reissue claims and they are barred under the recapture rule." *In re Youman*, 679 F.3d 1335, 1344-45 (Fed. Cir. 2012). (A13.)

That analysis, which the District Court performed in concluding that Antares surrendered non-jet injectors, faithfully reflects the three-part recapture rule established in *Youman, Mostafazadeh* and *Hester*. *See supra* pp. 31-34. In light of the District Court's accurate application of the recapture rule, Antares's strained reading of the opinion below is meaningless.[3]

Beyond that, Antares's arguments about the application of the "overlooked aspects" doctrine make no practical sense. Contrary to Antares's assertions, the "overlooked aspects" doctrine is not a legal "threshold" question that must be addressed before a recapture analysis or which calls into question "whether the recapture rule is even triggered." (ANT22-23.) Instead, as this Court's decision in

[3] This Court's role is to "review decisions, not opinions, and when [it is] able to fully comprehend the specification, prosecution history, and claims and can determine that, to the extent [it has] indicated, the district court arrived at the correct conclusion, [it] need not exalt form over substance and vacate what is essentially a correct decision." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1317-18 (Fed. Cir. 2007) (*citing Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983)).

*Youman* makes clear, the "overlooked aspects" doctrine is a separate question addressed in reissue claims that applies ***independently*** of the recapture doctrine:

> Rather, as we explained in *Mostafazadeh*, 'overlooked aspects' is a separate inquiry under reissue ***that is independent of <u>whether or not</u> the recapture rule applies.***

*Youman*, 679 F.3d at 1347. Thus, it was entirely appropriate for the District Court to consider the reissue claims ***both*** in the context of the recapture rule and the "overlooked aspects" doctrine. In circumstances when an applicant seeks through reissue a claim directed to some truly overlooked invention/embodiment/species that was disclosed but not originally claimed, that reissue claim still must not violate the recapture rule. If, as Antares argues, the "overlooked aspects" doctrine could preclude application of the recapture rule, then applicants would be allowed to expand their claims on reissue to cover surrendered subject matter ***whenever*** they pointed to an allegedly "overlooked aspect."[4]

As such, the District Court did not, as Antares argues, "erroneously fail[] to consider" the issue of "overlooked aspects" as a threshold question. (ANT25.)

---

[4] Antares points to the testimony of Medac's expert, Mr. Leinsing, for the unremarkable proposition that Antares's "safety features" could possibly be used with other types of injection devices. (ANT16; ANT28.) That does not help Antares. Mr. Leinsing's testimony simply confirms that the safety features at issue are unrelated to the surrendered jet limitation and, consequently, do not materially narrow the injection element of the reissue claims to avoid recapture. Indeed, the very fact that safety features can also be used with jet injectors confirms that the addition of safety features in the reissue claim ***does not*** make the reissue claim a separate non-jet embodiment.

Instead, the District Court properly relied on *Hester* and *Mostafazadeh* (and other controlling authorities) to conclude that Antares could not expand its claims to cover the surrendered non-jet injectors under the recapture rule. The District Court could not reach any other conclusion given the facts that: (1) Antares plainly sought to recapture the surrendered subject matter of non-jet injectors; and (2) the purportedly "overlooked" safety features in the reissue claims were ***already*** claimed in the original '015 patent and were unrelated to the surrendered subject matter.

### D. Antares's Argument That This Case Is An "Issue Of First Impression" Is Incorrect

Antares argues that its appeal presents an issue that this Court has never previously considered because:

> [W]hile this Court has repeatedly stated that "overlooked aspects of this disclosed invention" can be claimed in reissue without the "need to apply the recapture rule in the first place," this Court has not had the opportunity to actually apply this principle. (ANT16-17.)

That is incorrect. This Court has considered -- and rejected -- efforts by patentees to nullify the effects of argument and amendments made during prosecution by alleging "overlooked aspects" years after the fact.[5]

[5] Antares relies heavily on one example from the MPEP. (ANT23-24; ANT30.) That reliance is misplaced. This Court has repeatedly made clear -- and in fact the MPEP, itself, states -- that the MPEP "does not have the force of law." *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1384 (Fed. Cir. 2012); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1425 (Fed. Cir. 1988); *see also* MPEP at

### 1. This Court's Decision In *Hester* Is Controlling And The District Court Properly Applied That Decision

The facts of the present case closely track the facts presented in *Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472 (Fed. Cir. 1998). Like the "jet injection device" claims of the original '015 patent here, the *Hester* original patent claims required a food cooking system that cooked "solely with steam" using "two sources of steam." *Id.* at 1475. During prosecution, the *Hester* applicants distinguished prior art by pointing to the "solely with steam" and "two sources of steam" limitations, just like Antares here did with "jet injection device." *Id.* at 1475-76.

The *Hester* applicants then sought and obtained reissue claims that eliminated the "solely with steam" and "two sources of steam" limitations, again, like Antares did here with respect to "jet injection device." *Id.* at 1476-77. In the *Hester* decision, this Court held that the elimination of those claim limitations was inconsistent with the recapture rule:

> We share the district court's discomfort with [applicant's] attempt to remove, through reissue, the "solely with steam" and "two sources of

---

Foreword. While the PTO's "interpretation of [the] statute it administers is entitled to deference, [] the courts are the final authorities on statutory construction. They must reject administrative constructions . . . that are inconsistent with the statutory mandate" -- in this case, the mandate of §251. *Ethicon*, 849 F.2d at 1425 (citing *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981)).

> steam" limitations ***after having relied so heavily on those limitations to obtain allowance of the original patent claims over the prior art***. This concern is addressed most squarely by the "recapture rule," . . . . The recapture rule "prevents a patentee from regaining through reissue . . . subject matter that he surrendered in an effort to obtain allowance of the original claims." . . . The rule is rooted in the "error" requirement in that ***such a surrender is not the type of correctable "error" contemplated by the reissue statute***.

*Id*. at 1480 (internal citations omitted).

In *Hester*, this Court also considered "overlooked aspects." *Id.* at 1482-83. After analyzing the facts at issue in *Hester*, the Court found both that the newly-added limitations to the reissue claims were not, in fact, "overlooked" and that the recapture rule applied. *Id*. at 1483.

Specifically, the Court in *Hester* found that the newly-added "spiral conveyance path" and "high humidity steam" limitations were similar to limitations found in the original claims and, therefore, were not "overlooked aspects" at all. *Id.* That is the case here as well: the "safety features" Antares added to the reissue claims -- such as "needle guard," "latch," and "pushbutton" -- work together to avoid accidental needle sticks as did safety features that ***already existed*** in the original claims. (*See supra*, pp. 3-4; 25-26.)

In *Hester*, this Court further explained that arguments directed to "overlooked aspects" are particularly suspect when the prosecuting attorney has the opportunity to draft reissue claims many years later with the accused product in mind:

> No doubt if two patent attorneys are given the task of drafting patent claims for the same invention, the two attorneys will in all likelihood arrive at somewhat different claims of somewhat different scope. And such differences are even more likely when, as here, the second attorney ***drafts the new claims nearly a decade later and with the distinct advantage of having before him the exact product offered by the now accused infringer***. This reality ***does not justify recapturing surrendered subject matter under the mantra of "failure to appreciate the scope of the invention."*** The circumstances of the case before us simply do not fit within the concept of "error" as contemplated by the reissue statute. *See Mentor [Corp v. Coloplast, Inc.]*, 998 F.2d [992,] 996 [(Fed. Cir. 1993)] ("Error under the reissue statute does not include a deliberate decision to surrender specific subject matter in order to overcome prior art, a decision which in light of subsequent developments in the marketplace might be regretted.").

*Hester*, 142 F.3d at 1484. [redacted] Medac's product has a pushbutton. Antares included "pushbutton" features in several of its reissue claims even though: (1) Antares's own product does not include a pushbutton, and (2) more than a decade had passed since Antares filed the first application leading to the '846 patent and Antares never previously claimed a "pushbutton."

### 2. The District Court's Decision Is Also Consistent With *Mostafazadeh*

After the *Hester* decision -- which remains controlling law -- this Court also considered "overlooked aspects" in *In re Mostafazadeh*, 643 F.3d 1353 (Fed. Cir.

2011). This Court's analysis in *Mostafazadeh* also confirms that Antares's assertions concerning the role of "overlooked aspects" are incorrect. In *Mostafazadeh*, this Court made clear that the question of whether or not the added limitations in a reissue claim are classified as "overlooked aspects" is a separate question that is independent of the recapture analysis. 643 F.3d at 1360.

During prosecution, the *Mostafazadeh* applicant overcame a prior art rejection by adding the limitation "***circular*** portion formed as an attachment pad." *Id.* at 1356-57. Within two years, the *Mostafazadeh* applicant filed a reissue application seeking to broaden the scope of the claims by removing "circular" from the attachment pad limitation. *Id.* The applicant also added three supposedly overlooked limitations to the reissue claim, none of which related to the attachment pad. *Id.*

This Court in *Mostafazadeh* conducted the three-part recapture analysis focusing on whether the claims were materially narrowed so as to avoid the recapture rule. *Id.* at 1358. Contrary to Antares's assertions that the Court must conduct an overlooked aspects analysis "before turning" to recapture, or as a "threshold question," this Court in *Mostafazadeh* affirmed the rejection of claims for violating the recapture rule without conducting the separate overlooked aspects inquiry in the way that Antares proposes. Indeed, in reviewing the opinion of the then Board of Patent Appeals and Interferences, this Court found that the Board

erred in focusing on whether the added limitations were "directed to one or more overlooked aspects of the invention." *Id.* (noting the "Board's reliance on this portion of the MPEP is misplaced.").[6]

Ultimately, as this Court explained, the proper analysis of added limitations must focus not on whether they were overlooked aspects (which is a separate question) but rather on whether they are ***related*** to the surrendered subject matter. *Id*. at 1361. The recapture rule is always triggered "where the reissue claims are broader than the patented claims because the surrendered subject matter has been reclaimed. . . ." *Id*. at 1360. The recapture rule is independent from any "overlooked aspects" inquiry, and is fully applicable regardless of any such separate inquiry. *Id*.; *see also Youman*, 679 F.3d at 1347. Where claims are both broadened and narrowed, the recapture rule proceeds on a "limitation by limitation basis." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1350 (Fed. Cir. 2004). Where, as here, "an added limitation has been eliminated," the proper question with respect to limitations added to the reissue claims is whether they are ***related*** to the surrendered subject matter. *Mostafazadeh*, 643 F.3d at 1361.

[6] Indeed, at oral argument before this Court, "the PTO conceded . . . that this ["overlooked aspects"] portion of the MPEP is unrelated to recapture." *Id.*

In *Mostafazadeh*, this Court determined that when the patentee omitted a surrendered "circular" limitation from its reissue claims, three supposedly overlooked limitations that were unrelated to the surrendered limitation could not save the claim from violating the recapture rule. *Id.* Similarly, here, the safety feature limitations that Antares added ***are completely unrelated to the surrendered non-jet subject matter*** and do not save the claims.[7]

### E. Antares's Efforts To Claim Non-Jet Injectors Is Inconsistent With The "Original Patent" Requirement Of 35 U.S.C. § 251

As the District Court further recognized, the "original patent" requirement [of §251] is a ***second and independent requirement***" from the "error" requirement of §251. (A11 (citing *Hester*, 142 F.3d at 1479).) The original patent requirement "restricts a reissue patent to the invention disclosed in the original patent." *Id*.

Specifically, §251 states that "the Director shall . . . reissue the patent for the invention disclosed in the original patent." Thus, reissue claims must be "described in the original patent specification and enabled by the original patent specification such that 35 U.S.C. §112, first paragraph is satisfied." (A966 (MPEP § 1412.01)); *In re Amos*, 953 F.2d 613, 618 (Fed. Cir. 1991). "[T]he essential inquiry under the 'original patent' clause of §251 [] is whether one skilled in the

[7] Antares admits that the presence of safety features is unrelated to whether or not an injector is a "jet injector." (ANT18.)

art, reading the specification, would identify the subject matter of the new claims as invented and disclosed by the patentees." *Amos*, 953 F.2d at 618.

### 1. Antares Ignored The "Original Patent" Requirement During Preliminary Injunction Proceedings

In its Opposition to Antares's Amended Motion for Preliminary Injunction, Medac explained in detail why Antares's efforts to expand the scope of its claims beyond jet injectors was not consistent with the "original patent" requirement of §251. (A487; A496-97.) For example, Medac explained that "[t]he '846 specification [and the '015 patent] unequivocally states: ***The present invention relates to a needle assisted jet injector.***" (A497 (emphasis in original).) Medac further pointed out that "[e]very figure and passage cited as support for the asserted reissue claims also relate only to a needle-assisted jet injector." (A497; A598-99.) And, Medac referenced the admissions of Antares's inventor confirming that the invention was directed to jet injectors. (A497.)

Antares did not even try to address Medac's "original patent" argument in its reply brief below. (A823-25.) And, Antares did not address the substance of Medac's "original patent" challenge during oral argument before the District Court, despite the fact that Medac pointed out that Antares was "utterly silent on the original patent doctrine" and "[i]t stands unrebutted." (A1310-11/64:19-65:16; *see also* A1350-51/104:13-105:2.) Instead, Antares tried to side step the "original patent" issue by arguing that "we can keep that [original patent analysis] together

[with the recapture analysis] because the Patent Office had looked at that in the reissue/recapture concept." (A1351/105:2-4.) Antares's statement is inconsistent with the law providing that the "error" and "original patent" statutory requirements are separate and distinct. It also fails to demonstrate how the written description in the specification could possibly support the non-jet injector of the new claims. *See Amos*, 953 F.2d at 618.

### 2. The Entirety Of The '015 Patent Disclosure Is Directed To Needle-Assisted Jet Injectors

Antares cannot identify any embodiment, description, figure or other disclosure in the '015 patent that is directed to ***anything other than a jet injector***. Instead, Antares points to a single paragraph from the specification (A103/11:57-12:14) which describes the supposedly "overlooked" safety features. (ANT9.) Antares argues that the cited paragraph "does not use the word 'jet' and although it is understood that these features ***can*** be used with jet injectors, there is no requirement that they ***must*** be used with jet injectors." (ANT9-10 (emphasis in original).) According to Antares, "[t]he safety features apply to ***any*** needle-based automated injector." (*Id.*)

Antares's arguments do not withstand scrutiny. First, the paragraph to which Antares cites relates directly to the embodiment of Figures 14a and 14b, each of which is undisputedly a cross-sectional view of ***"a needle assisted jet injector."*** (A103/11:57-12:14; A100/5:34-39.) Indeed, all of the reference

numerals that appear in the cited paragraph correspond to the structures shown in Figures 14a and 14b. (A83-84.)

Second, Antares's suggestion that the safety features can be used with "any" type of injector is irrelevant because, as stated above, no disclosure of "any" injector ***other than*** a needle-assisted jet injector exists anywhere in the patent. Moreover, Antares expressly told the PTO that a jet injector defines a ***structurally different*** type of injector than a manual syringe or autoinjector. (A559; A572-74; A581-84/¶¶4-10; A532-39/102:4-109:10.) Because the invention disclosed in the original '015 patent is limited to a needle-assisted jet injector, and the inventors expressed a clear intent to claim ***only*** a needle-assisted jet injector (and not autoinjectors or hand-powered syringes), Antares's reissue claims broadly directed to "an injection device" do not satisfy the "original patent" requirement of §251.

#### a. The "Present Invention" Statements Limit Antares's Patent To Needle-Assisted Jet Injectors As A Matter of Law

This Court has held that where, as here, the patentee uses "present invention" in the specification, such wording operates to limit the scope of the invention. *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *see also Astrazeneca AB v. Hammi USA*, 554 Fed. Appx. 912, 915 (Fed. Cir. 2014) ("That language clearly defines 'the present invention' not as salts of omeprazole . . . but as a ***particular set*** of 'new' salts of [] omeprazole limited to the six named cations.").

Here, the specification language makes clear that the alleged invention of the ‘846 patent (and original ‘015 patent) relates only to needle-assisted jet injectors, beginning with the title of the patent, “Needle Assisted Jet Injector.” (A70.) As detailed *supra*, the specification uses the term “present invention” 22 times and ***in each and every instance*** that term refers to needle-assisted jet injectors. Beyond that, the ‘846 patent (and original ‘015 patent) consistently touts the advantages of needle-assisted jet injectors over autoinjectors and manual syringes. (A98/2:9-12; A98/2:14-16; A104/13:26-29.) The reissue claims, therefore, cannot encompass more than needle-assisted jet injectors. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) *rev’d on other grounds*, 236 F.3d 1342 (Fed. Cir. 2001).

**b. Antares’s Argument About the Word “Particularly” Is Unsound**

Antares argues that “[b]oth ‘injection device’ and ‘jet’ are supported by the specification, and a jet is a type of injection device.” (ANT15.) As supposed support for that argument, Antares points to the FIELD OF THE INVENTION section of the ‘846 patent which states: “The ***present invention*** is directed to a device for delivery of medicament, and ***in particular*** to a ***jet injector*** . . . .” (A98/1:24-27.) According to Antares, the phrase “in particular” means that “the specification is thus directed generally to injection devices, and the patent uses jet injectors to exemplify different aspects of the invention.” (ANT15.) That is legally and factually incorrect.

This Court has recognized that when a specification states that it is "more particularly" limited to identified subject matter (here, "jet injectors") such statements inform the scope of the invention. *See Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 692-93 (Fed. Cir. 2008); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1306 (Fed. Cir. 2005); *see also Bose Corp. v. SDI Techs., Inc.*, 558 Fed. Appx. 1012, 1019-1020 (Fed. Cir. 2014). And again, there is not a single example of anything ***other than*** jet injectors disclosed anywhere in the original or reissue patent.

### 3. Antares's Failure To Satisfy The "Original Patent" Requirement Is An Alternate Ground For Affirmance

It is well-established that "an appellate court may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." *Glaxo Group Ltd. v. Torpharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998). In this case, the judgment of the District Court was the denial Antares's motion for a preliminary injunction. Medac can, therefore, assert any alternative ground for affirmance of that judgment that the record supports. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 822 n.1 (Fed. Cir. 1989). And, this Court routinely affirms judgments on alternative grounds. *See, e.g., Hester*, 142 F.3d at 1480 (affirming summary judgment of invalidity on recapture grounds even though the district court did not reach that issue); *see also*

*In re Aoyama*, 656 F.3d 1293, 1301 (Fed. Cir. 2011); *Nystrom v. Trex Co., Inc.*, 580 F.3d 1281, 1282 (Fed. Cir. 2009).

In this case, Medac's showing that Antares failed to satisfy the "original patent" requirement of §251 presents precisely the type of issue that lends itself to review by this Court. *See Glaxo Group*, 153 F.3d at 1371 ("If [] the ground urged is one of law, and that issue has been fully vetted by the parties on appeal, an appellate court may choose to decide the issue even if not passed on by the trial court."). The failure of Antares to satisfy "original patent" requirement presents an issue of law under §251. *See Medtronic, Inc. v. Guidant Corp.*, 465 F.3d 1360, 1373 (Fed. Cir. 2006). Any factual issues underlying the question of law are confined to the text of the written specification of the patent. Medac has already demonstrated that the reissue claims of the '846 patent -- if permitted to cover non-jet injectors -- would be unsupported by the specification of the original patent. (*See supra* pp. 44-49.) Indeed, in its detailed analysis of the intrinsic record, the District Court already made the requisite findings to support such a ruling. (A14.)

### F. Antares's Arguments About The Kramer Prior Art Reference Are Unavailing

Antares makes much of the fact that the Patent Examiner cited the Kramer prior art reference against pending claims in both the original '015 patent and in the '846 reissue patent. (ANT11-12; ANT30-31.) Because both patents ultimately issued, Antares argues that the Patent Examiner must have agreed that Antares was

entitled to claims that cover injectors in general rather than jet injectors. (*Id*.) As an initial matter, Antares's efforts to read the Examiner's mind have no evidentiary value. And, by the time the Examiner cited Kramer during prosecution of the reissue application, Antares ***already*** had surrendered non-jet injectors by argument and amendment in the '015 patent.

Beyond that, Antares's argument that the Kramer reference was "distinguished in different ways" -- during the prosecution of the original '015 patent "in view of the 'jet' limitation" and during the prosecution of the '846 reissue based on "safety features" (ANT30-31) -- is inaccurate. During prosecution of the '015 patent claims, in response to the PTO's rejection of now-issued claim 17 (which includes safety features), Antares distinguished that claim from Kramer on the basis of its different ***<u>safety</u>*** features:

> Claim 17 recites ***an activation element*** that activated the force generating source ***upon retraction of the shield from the protecting position to the injection position***. The injection position is defined as a position in which the tip of the needle is exposed for insertion to the insertion point. ***This is also contrary to the teaching in Kramer, in which the spring 34 is activated before there is any movement whatsoever of the needle 14 in relation to the front barrel 18.*** (A654.)

Then, during prosecution of the '846 reissue claims, Antares distinguished Kramer on the ***same*** basis:

> In addition, ***Kramer et al. does not suggest or teach a spring retained in a state of compression*** by a latch located within the proximal end

> of an outer housing ***before the needle guard moves toward the retracted position***. (A600-01.)

These arguments further confirm that "safety features" were not overlooked at all and that Antares claimed substantially the same "safety feature" subject matter in the reissue as it did in the original patent. And, the Examiner's allowance of the reissue claims over Kramer does not change the fact that ***nothing but*** jet injectors are disclosed in the '846 patent (and original '015 patent).

### G. Antares's Arguments About The District Court's Infringement Decision Are Incorrect

Antares relegates to the final page-and-a-half of its brief an argument that the District Court supposedly erred in finding that Medac had raised a substantial question on Antares's likelihood of success in proving infringement even if the reissue claims are limited to a "jet injector."[8]

---

[8] Antares complains that the District Court relied on §251 for purposes of its claim construction and non-infringement analysis. That complaint is without merit. In conjunction with its correct analysis under §251 (with respect to impermissible recapture due to surrender by argument and amendment), the District Court properly concluded that the '846 reissue claims could not be validly expanded beyond jet injectors to include "injectors in general." (A15-16.) Thus, during the early stages of this case -- and in the context of a preliminary injunction motion brought by Antares -- the District Court framed the merits conclusion as one of non-infringement because the accused device is not a "jet injector." As part of its analysis, the District Court found that the recapture rule would prevent the reissue claims from covering jet injectors. Thus, whether the issue is considered one of claim construction or improper recapture during reissue, the District Court properly denied the preliminary injunction because Antares failed to show a likelihood of success on the merits.

Antares first attacks the District Court's construction of "jet-injector," which is set forth below:

> The court construes "jet-injector" as "a powered injector used to achieve the delivery of medicaments in a high speed stream, that is, at a pressure, force, and speed sufficiently high so that the medicament exits the needle tip as a fluid jet and not as a bolus. The critical difference between a jet injector and autoinjector or hand-powered syringes is how the medicament is delivered -- dispersed remotely from the needle-tip (jet) rather than deposited in a locus near the needle tip (bolus)." (A5.)

Next, Antares suggests that the District Court looked only to the '631 patent for purposes of claim construction and did not consider the intrinsic evidence of the '846 patent. (ANT35.) That suggestion is incorrect. The District Court thoroughly evaluated the '846 patent (and '015 patent) record and concluded, for example, that:

> Given the prosecution history related above, there is every indication that the applicants surrendered all injectors but for "jet injectors," understood by those of skill in the art at the time to include only those injectors having a "jet . . . powerful enough to penetrate through a depth of tissue, such as muscle or skin layers, instead of being deposited as a bolus." [] Likewise, the applicants argued that "jet injectors" affected the structural recitations in the body of the original claims [ ] and, as noted, the structural features now claimed in the '846 patent were described in the specification of the '015 patent only in the context of a jet injector. (A14.)

Finally, Antares's criticism of the District Court's construction of "jet injector" is premised entirely on a single sentence appearing in the '846 patent specification. (ANT36.) As Medac explains below, however, the District Court's

construction is fully consistent with the intrinsic evidence of the '846 patent taken as a whole.

### 1. The District Court Properly Construed "Jet Injector" In View Of Both Intrinsic and Extrinsic Evidence

During prosecution, Antares also distinguished prior art by describing a "jet injector" as creating a jet that "is powerful enough to penetrate through a depth of tissue, such as muscle or skin layers, ***instead of being deposited as a bolus***." (A558.) Antares further emphasized the increased "dispersion" available given the force generating member of the jet injection device. In particular, Antares argued that the lack of a pre-compressed force generating member in the prior art "results in a [prior art] device that is more slowly responsive compared to the ***instantaneous injection and dispersion features*** of the present invention that are achieved by the release of the compressed force." (A786.)

[redacted] These drawings (modified by adding red color to the needle and yellow color to the medicament) are reproduced below:

***Confidential Material Redacted***

[redacted]

Thus, the District Court's construction of "jet injector" is consistent with the "definition" that Antares asserts was provided in the specification: "As used in this application, the term jet injection means a particular class of injector that injects medicament by creating ***a high-speed jet*** of the medicament that ***penetrates the tissue of the patient to a distance beyond the exit of the injector***." (A100/6:22-26.) The District Court's construction further confirms, based on statements Antares made to the PTO to obtain allowance of the claims, that "injecting the

medicament as a high-speed jet that penetrates to a distance beyond the exit of the injector" also means "***instead of being deposited as a bolus***." (A5.)[9]

If, as Antares asserts, the "definition" for "jet injector" is broad enough to cover depositing medicament as a bolus around the needle, as long as some portion of the medicament extends beyond the needle tip, then this "definition" would encompass manual syringes and autoinjectors. Such an interpretation is inconsistent with the remainder of the intrinsic evidence, and is necessarily wrong. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) ("claims must be construed so as to be ***consistent with the specification***, of which they are a part"); *see also Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (patentee permitted to be his own lexicographer "[s]o long as the meaning of [the] expression is made reasonably clear ***and its use is consistent*** within [the] patent disclosure").

[9] According to Antares, the "definition" was "reiterated during prosecution." (ANT36.) In reality, the "definition" provided during prosecution was that the jet would penetrate to a "significant distance beyond the exit of the injector." (A572; A581.) Antares later amended the specification to add this definition but dropped the word "significantly." (A659.) Thus, even between the specification and prosecution history, this "definition" fluctuated. But none of that changes the repeated representations that Antares made to the Patent Office differentiating the characteristic of jet injector deposition "remotely from the needle-tip" or from the "bolus" deposition that characterizes non-jet injectors. (A5; *see also* A558; A572; A581-82; A785.)

### 2. The District Court Properly Held That Medac's Product Is Not A "Jet Injector"

During District Court proceedings, Antares sought to manufacture an infringement claim by proposing that a "jet injector" can be any device that uses sufficient pressure "such that the injection depth extends beyond the end of the needle." (A378-79.) According to Antares's expert, Mr. Fisher, if ***any*** portion of the bolus extends beyond the tip of the needle, ***even 1/100th of a millimeter***, the injector is a "jet injector." (A1228-29/72:4-73:7.) That argument, however, defies common sense and simply cannot be reconciled with the intrinsic evidence. (A704-05/¶¶77-78.) For example, that argument directly contradicts what Antares told the PTO to obtain the '015 patent. (A572; A581.) And, Antares's argument improperly would sweep in hand-powered syringes.

According to tests performed by Antares's own expert (Mr. Fisher), Medac's RASUVO™ product deposits the medicament as a bolus near the needle tip, just like a hand-powered syringe -- and not as a fluid jet. (A1233; A1235.) The photographic evidence in the record of the District Court (and reproduced below) of those tests shows that the RASUVO™ product and a hand-powered syringe both deposit medicament as a bolus:





**Conventional Needle** **Medac's RASUVO™ Product**

Medac's expert, Mr. Leinsing, replicated Mr. Fisher's test procedures and compared the deposition patterns of Medac's RASUVO™ product and the hand-powered prefilled methotrexate syringes sold by medac GmbH in Europe. Those tests, like the ones performed by Mr. Fisher, showed that both products delivered the medicament as a bolus near the needle tip, and not as a fluid jet. (A706-07/¶¶82-87.) Mr. Leinsing's tests, however, revealed that the hand-powered syringes ***also*** delivered medicament beyond the end of the needle. (A707/¶86.) That evidence is reproduced below from the District Court record:





**Hand-Powered Syringe** **Medac's RASUVO™ Product**

In its brief, Antares ignores this evidence -- which, in part, is based on experiments of its ***own*** expert. Instead, Antares points to a preliminary clinical study conducted by Becton Dickinson concerning the injection depth of Medac's RASUVO™ product and hand-powered methotrexate syringes. Based on that study, Antares argues that Medac's autoinjector product could deposit medicament to a depth greater than a manual injector. (ANT36-37 (citing A836-38/¶¶15-22).) But, analysis of that study shows that Antares is relying on only one data point out of 480 and -- critically -- that Antares ignored the conclusion of the overall study. This is the study conclusion: "The mean fluid depot depth was ***statistically not different*** between the auto-injector (8.2 mm; SD: 2.5) and the prefilled syringe as

alone (8.3 mm; SD: 2.2)." (A1114.)[10] And, the authors of the study expressly stated that the single data point upon which Antares relied was a "***statistically outlying value***":




(A1241.) Accordingly, the District Court correctly discounted Antares's reliance on that single statistically insignificant data point. (A6-7.)

---

[10] Antares argues that "even one instance of infringement is still infringement," analogizing to the concept of infringement in "trace amounts" and citing *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1356 (Fed. Cir. 2013) (ANT36). In that case, however, ***every*** accused product contained "trace amounts" of an infringing compound. The single statistically insignificant data point to which Antares points confirms Antares cannot possibly assert that to be the factual scenario here. This Court, moreover, has made clear that the theoretical capability of infringing is not sufficient to support a finding of infringement. *See, e.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

When all is said and done, nothing in the study describes whether the medicament was deposited as a fluid jet or as a bolus.

## H. The District Court's Analysis Of The Remaining Three Preliminary Injunction Factors Does Not Help Antares

Throughout its brief, Antares repeats the assertion that the District Court "agreed with Antares that it was likely to suffer irreparable harm" in the absence of an injunction. (ANT3; ANT5.) As an initial matter, alleged irreparable harm is irrelevant where, as here, the patentee failed to show a likelihood of success on the merits. *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994) (likelihood of success and irreparable harm are the "fundamental preliminary injunction requirements" and must ***both*** be proven).

Beyond that, Antares overstates what the District Court found with respect to alleged irreparable harm. The District Court focused "particularly" on the issue of "tier pricing" for formularies (A16-17.) In that regard, Antares repeatedly argued to the District Court that Medac's RASUVO™ product should be regarded as a generic version of OTREXUP™ and that, once it received FDA approval, Medac would price its product as a generic -- thereby endangering Antares's formulary position. (A384.)

In parallel, Antares filed a Citizen Petition asking the FDA to apply its regulations differently with respect to RASUVO™ and to categorize RASUVO™ as a generic version of OTREXUP™ -- rather than as a branded product in its own

right. As stated above (*supra* p. 11), however, Antares's Citizen Petition was premised on demonstrably incorrect assertions. Medac promptly advised Antares of those incorrect assertions (and provided Antares with Medac's complete NDA as confirmation) and requested that Antares withdraw or correct its petition. Antares, however, refused. (A1100-01.) Accordingly, on May 22, 2014, Medac was forced to file responsive comments with the FDA. (A1001-09.)

On July 10, 2014, the FDA denied Antares's Citizen Petition on the same grounds that Medac pointed out to Antares months earlier. Because the District Court denied Antares's preliminary injunction motion on the same day as the FDA ruling, the District Court did not have an opportunity to review that ruling. The FDA's ruling confirmed that RASUVO™ cannot possibly be considered a generic version of OTREXUP™.[11] Accordingly, Antares's arguments that generic pricing would endanger its formulary tier position are unfounded.

Beyond that, the District Court found that the "balance of hardships" and "public interest" factors were "neutral." (A17.) Like the "merits" factor, those factors also do not favor an injunction.

## I. The Relief That Antares Seeks Is Legally Inappropriate

In the "Conclusion" section of its brief, Antares argues that the "district court's order should be reversed and the case remanded ***with instruction for the***

---

[11] *See* http://www.regulations.gov/#!docketDetail;D=FDA-2014-P-0318

***entry of a preliminary injunction***." (ANT37.) That relief is not supported by the record or by the controlling authorities. Antares's appeal is directed to only one issue -- the District Court's application of the recapture rule under §251. (ANT2). As Medac has demonstrated, the District Court's application of that rule as part of its decision to deny Antares's preliminary injunction motion was correct.

Beyond that, in requesting an Order instructing "the entry of a preliminary injunction," Antares fails to acknowledge: (1) that this Court can also affirm the District Court's ruling on the alternative grounds of Antares's failure to satisfy the "original patent" requirement; and (2) that the District Court did not need to address several of the other substantial questions presented by Medac showing that Antares is not likely to succeed on the merits with respect to the '846 patent -- *e.g.*, noninfringement for failure to meet the "latch" limitation and invalidity for anticipation/obviousness under §§102 and 103.[12] Factual inquiries remain with respect to these contentions and it would "not [be] appropriate for this court to make such highly factual inquiries for the first time on appeal." *Apple, Inc. v.*

[12] Moreover, Medac's arguments with respect to the likelihood of success on the merits regarding the '846 patent were limited due to the expedited nature of the preliminary injunction proceedings. To the extent there are further District Court proceedings, Medac intends to raise each of its prior defenses again -- in addition to equitable defenses, including intervening rights. *See, e.g.*, 35 U.S.C. §252; *Seattle Box Co., Inc. v. Indus. Crating & Packaging Inc.,* 756 F.2d 1574, 1579 (1985) (noting that "when certain conditions are present a reissue shall not abridge or affect certain rights of those who acted before the reissue was granted" and considering defendant's "substantial preparation . . before the grant of reissue.").

*Samsung Elecs. Co.*, 678 F.3d 1314, 1332 (Fed. Cir. 2012); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007); *Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1362-63 (Fed. Cir. 2002) ("Factual determinations [in preliminary injunction cases] rest within the province of the trial court, not the appellate court. . . . Thus, the appropriate remedy is not to reverse with instructions to enter the injunction, as [plaintiff] asks, but rather to vacate the trial court's previous order and remand for further proceedings in light of this opinion.").

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

In view of the foregoing, Medac respectfully submits that, this Court should affirm the District Court's denial of Antares's motion for a preliminary injunction.

Respectfully submitted,

*/s/ Christopher J. Harnett*
Christopher J. Harnett
James F. Haley, Jr.
Ching-Lee Fukuda
Hassen A. Sayeed
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000

Attorneys for Defendants-Appellees
medac Pharma, Inc. and medac GmbH

August 15, 2014

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Rule Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒ The brief contains 13,896 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐ The brief uses a monospaced typeface and contains [*state the number*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman, or

☐ The brief has been prepared in a monospaced typeface using [*name and version of word processing program*] with [*of characters per inch and name of type style*].

Dated: August 15, 2014

*/s/Christopher J. Harnett*
Christopher J. Harnett

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2014, I caused the foregoing **Non-Confidential Brief of Defendants-Appellees medac Pharma, Inc. and medac GmbH** to be electronically filed with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of the filing to all counsel for the parties registered as CM/ECF users, including the following:

Imron T. Aly
(Principal Counsel)
Richard J. Hoskins
Sailesh K. Patel
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
ialy@schiffhardin.com
rhoskins@schiffhardin.com
spatel@schiffhardin.com
*Counsel for Plaintiff-Appellant*
*Antares Pharma, Inc.*

Pursuant to an agreement between the parties, the non-confidential brief will be emailed to the above counsel on this date.

September 18, 2014

/s/*Christopher J. Harnett*
Christopher J. Harnett